ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Precision Standard, Inc. ) ASBCA No. 59116
)
Under Contract No. SPM4A7-08-M-B239 )

APPEARANCE FOR THE APPELLANT: Nancy M. Camardo, Esq.
Camardo Law Firm, P.C.
Auburn, NY

APPEARANCES FOR THE GOVERNMENT: Daniel K. Poling, Esq.
DLA Chief Trial Attorney
Robert E. Sebold, Esq.
Trial Attorney
DLA Aviation
Richmond, VA

## OPINION BY ADMINISTRATIVE JUDGE HARTMAN
## ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The government moves for summary judgment, asserting that its contracting officer (CO) appropriately terminated appellant's contract for default because Precision Standard, Inc. (PSI) was delinquent in submitting the contractually required first article and PSI has provided no evidence of excusable delay. Appellant asserts the government's motion should be denied because there are genuine issues of material fact regarding: (1) why the CO did not exercise her discretion to terminate the contract at "no cost" and (2) why its lack of delivery of the first article here was not "excusable." According to PSI, it could not schedule the quality assurance representative (QAR) inspection necessary for first article delivery due to QAR scheduling problems arising from the "sequester" and furlough of government employees.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

In June 2008, the Defense Supply Center, Richmond (which has been renamed Defense Logistics Agency Aviation), a field activity of the Defense Logistics Agency (DLA), awarded a contract, No. SPM4A7-08-M-B239, for the supply of 32 aircraft "formers" for A-10 aircraft, National Stock Number (NSN) 1560-01-553-7553, part number 160414007-74, to appellant, PSI (R4, tab 1 at 1, 3). Aircraft "formers" are a "CRITICAL APPLICATION ITEM," where "failure...could injure personnel or

jeopardize a vital agency mission" (R4, tab 1 at 5; Federal Acquisition Regulation (FAR) 46.203(c)).

The parties' contract required PSI to submit a first article for testing by the Engineering Support Activity (ESA) for the A-10 aircraft program at Hill Air Force Base in Ogden, Utah (R4, tab 1 at 4-5, 10, 13-14). The first article was due 9 February 2009, and ESA had 120 days to evaluate that article. If ESA approved the article, the production quantity of 32 was due 200 days after the approval. (R4, tab 1 at 2, 9)

The parties' contract incorporated by reference various standard clauses, including FAR 52.209-4, FIRST ARTICLE APPROVAL – GOVERNMENT TESTING (SEP 1989); and FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984). (R4, tab 1 at 15; FAR 52.252-2, CLAUSES INCORPORATED BY REFERENCE (FEB 1998)) The initial clause states:

> (a) The Contractor shall deliver ____ unit(s) of Lot/Item ____ within ____ calendar days from the date of this contract to the Government at [*insert name and address of the testing facility*] for first article tests....

> (b) Within ____ calendar days after the Government receives the first article, the Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article....

> (c) If the first article is disapproved, the Contractor, upon Government request, shall submit an additional first article for testing.... The Contractor shall furnish any additional first article to the Government under the terms and conditions and within the time specified by the Government....

> (d) If the Contractor fails to deliver any first article on time, or the Contracting Officer disapproves any first article, the Contractor shall be deemed to have failed to make delivery within the meaning of the Default clause of this contract.

The latter clause states:

> (a)(1) The Government may, subject to paragraphs (c) and (d) of this clause, by written notice of default to the

2

Contractor terminate this contract in whole or in part if the Contractor fails to –

(i) Deliver the supplies...within the time specified in this contract or any extension;

....

(c) [Unless] the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the Contractor.

PSI did not submit the first article by its due date, 9 February 2009 (R4, tab 8 at 6). Over three months after the due date, on 21 May 2009, PSI submitted a first article but material certifications, as well as process specifications for the passivate and heat treatment, were missing (R4, tab 8 at 6-21, tab 9 at 1-2). When PSI did not respond to requests for the missing materials, ESA disapproved the first article (R4, tab 10). By letter dated 17 November 2009, DLA's CO advised PSI that if it paid extra costs incurred for government testing and offered DLA some other consideration for its contractor-caused delay, it could re-submit the disapproved first article after it had corrected the following discrepancies:

1. Print requirement is .32 R +/- .03; Actual measurement is one side is .28[,] the other is .32.
2. As per the contract page 4 item numbers 4, and 5 require that all material certs, and process certs and purchase orders; None were sent with the First Article, and these certifications were requested again through the DLA contracting office. The contractor sent none of the requested certifications.

The CO added that, on resubmission of the first article, a new delivery date would be established and memorialized in a contract modification. The CO further advised that PSI could alternatively: (1) submit a rebuttal letter regarding the first article test for review by both DLA and ESA or (2) request a no-cost cancellation/termination of the parties' contract and, if the request was acceptable to DLA, the parties' contract would be "cancelled or terminated." The CO stated PSI shall respond to her letter within ten workdays after receipt of her letter and, if it did not, the "contract may be cancelled or terminated without further notification." (R4, tab 10)

PSI submitted a rebuttal in January 2010 asserting, among other things, that it rejected any "no-cost" termination; the disparity in first article dimension could be readily corrected in production at minimal cost; and the sole material certification was

3

attached to the test report it submitted with the first article. It did not, however, furnish a copy of that certification (R4, tabs 13, 16). In June 2011, DLA's CO gave PSI the opportunity to submit a second first article and propose a revised delivery schedule for the contract (R4, tab 17 at 2).

By bilateral contract Modification No. P00001 executed 18 December 2012, the parties established a new delivery date of 22 January 2013 for the first article (R4, tab 2 at 1-2, tabs 18, 19). PSI, however, did not submit a second first article by the specified date (R4, tab 21).

By letter dated 29 July 2013, DLA's CO sent PSI a letter stating she was considering terminating the parties' contract for default and PSI was being given the opportunity to present facts bearing on the question within ten days after receipt (R4, tab 21). While PSI received the CO's letter, it did not respond within the time specified (R4, tabs 22, 23).

DLA, however, provided PSI a third opportunity to submit a first article. By bilateral contract Modification No. P00002, the parties established a new delivery of 18 October 2013 for the first article. The parties also modified their contract to provide:

> [I]f the First Article re-submission is not delivered by the date...[due] or if the First Article is disapproved, (second disapproval), this contract may be terminated in its entirety at no cost to the Government.

(R4, tab 3)

PSI again failed to submit a first article by the specified date (R4, tab 23 at 3, tab 24). By final decision dated 13 December 2013, DLA's CO notified PSI that its contract was "terminated for default effective immediately" based on its "failure to perform in accordance with the terms and conditions of the contract, specifically your failure to deliver the supplies in accordance with the established delivery schedule" (R4, tabs 4, 25). PSI timely appealed the CO's decision to this Board.

DLA filed a motion for summary judgment in the appeal. PSI filed an opposition to DLA's motion asserting, among other things, that it was delayed in submitting a first article due to unavailability of an inspector and appending an affidavit from its chief operating officer providing in pertinent part:

> The Government, in its Motion, attempts to allege that the only effect that the sequester would have on the inspection was during the five-day furlough period, occurring between October 1 through October 5, 2013. However,

4

what the Motion failed to note [was] that the sequester affected a time period far beyond those date[s]. For a number of months the QARs were allowed to work only four days a week. This made scheduling inspections significantly more difficult. This difficulty is exacerbated by the fact that each QAR services numerous contractors and contract[]s.

(App. resp., aff. at 3, ¶ 7) Nowhere in the affidavit, however, does the affiant state that he or anyone else from PSI ever actually attempted to schedule an inspection of the first article with a QAR (*id.* at 1-3). DLA appended to its reply an affidavit from a quality assurance specialist with the Defense Contract Management Agency in Detroit, Michigan, who was assigned to PSI between September and December of 2013 stating:

During the September through December of 2013 time frame I was in Precision Standard's facility for several different business matters and had no knowledge that the first article test for contract SPM4A7-08-M-B239 was ready for inspection. To the best of my knowledge this first article test was never presented to the government for inspection.

(Gov't reply, decl. ¶ 2)

DECISION

DLA terminated PSI's contract for default based upon a failure to deliver the first article by the contractually specified date. It seeks summary judgment that its default termination was proper based upon the fact it is undisputed that PSI did not deliver the first article by its due date. (Gov't mot. at 2; compl. ¶ 16(c))

The standards set forth in FED. R. CIV. P. 56 guide us in resolving summary judgment motions. *J.W. Creech, Inc.*, ASBCA Nos. 45317, 45454, 94-1 BCA ¶ 26,459 at 131,661; *Allied Repair Service, Inc.*, ASBCA No. 26619, 82-1 BCA ¶ 15,785 at 78,162-63; Board Rule 7(c)(2). We will grant a summary judgment motion only if pleadings, depositions, interrogatory answers, and admissions on file, together with any affidavits or other evidence, show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. DLA, the party here seeking summary judgment, has the burden of demonstrating both of these elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); *Comptech Corp.*, ASBCA No. 55526, 08-2 BCA ¶ 33,982 at 168,082. PSI, who is the nonmoving party, is entitled to have all reasonable inferences drawn in its favor.

5

*Celotex Corp.*, 477 U.S. at 322-24; *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1306 (Fed. Cir. 2000).

It is well established that a default termination is a drastic sanction, which should be imposed and sustained only upon "good grounds and on solid evidence." *E.g., Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969). Contract provisions authorizing termination for default are a species of "forfeiture" and are to be strictly construed. *DeVito v. United States*, 413 F.2d 1147, 1153 (Ct. Cl. 1969); *King v. United States*, 37 Ct. Cl. 428, 434 (1902). DLA bears the burden of proving that a termination for default was justified. Once DLA has established a *prima facie* case in that regard, the burden of production – or of going forward – shifts to PSI. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir.), *cert. denied*, 519 U.S. 992 (1996); *Lisbon Contractors, Inc.*, 828 F.2d at 764-65; *Hanley Indus., Inc.*, ASBCA No. 56584, 14-1 BCA ¶ 35,699 at 174,812.

The parties' contract expressly provides that DLA may "by written notice of default to [PSI] terminate this contract in whole or in part if [PSI] fails to – (i) Deliver the supplies...within the time specified in this contract or any extension," unless "the failure to perform the contract arises from causes beyond the control and without the fault or negligence of [PSI]." FAR 52.249-8(a)(1), (c). DLA has shown, and it is undisputed, that PSI did not deliver the First Article by the contractually specified date. DLA, thus, has made a *prima facie* demonstration that its default termination was justified and the burden of production shifts to PSI to show "excusability." *See DCX*, 79 F.3d at 134; *Hanley Indus.*, 14-1 BCA ¶ 35,699 at 174,812; *Capy Mach. Shop, Inc.*, ASBCA No. 59085, 14-1 BCA ¶ 35,783 at 175,044.

PSI contends that its failure to submit the first article by the contractually-agreed date was excusable because it had the article "test and report ready for QAR inspection/approval before the due date of October 18, 2013," but "was unable to have the inspection performed by the due date, or at anytime shortly thereafter," due to the "sequester." According to PSI, because its contract had a "C" rating (the lowest in terms of priority) and QARs were only working four days a week, the scheduling of its inspection was made more difficult. (App. resp. at 10-11) As support for these contentions, PSI submitted an affidavit from its chief operating officer providing:

> The Government, in its Motion, attempts to allege that the only effect that the sequester would have on the inspection was during the five-day furlough period, occurring between October 1 through October 5, 2013. However, what the Motion failed to note [was] that the sequester affected a time period far beyond those date[s]. For a number of months the QARs were allowed to work only

6

four days a week. This made scheduling inspections significantly more difficult. This difficulty is exacerbated by the fact that each QAR services numerous contractors and contract[]s.

(App. resp., aff. at 3) Nowhere in the affidavit however does the affiant state that he or anyone else from PSI ever actually attempted to schedule an inspection of the First Article with a QAR (*id.* at 1-3).

DLA asserts there is no evidence of the government delaying PSI in obtaining an inspection of a First Article during fall 2013. It notes that PSI does not offer any evidence in the form of an email or other correspondence that it attempted to schedule an inspection. DLA also appends to its reply a declaration from the quality assurance specialist with the Defense Contract Management Agency in Detroit, Michigan, who was assigned to PSI between September and December of 2013, stating:

> During the September through December of 2013 time frame I was in Precision Standard's facility for several different business matters and had no knowledge that the first article test for contract SPM4A7-08-M-B239 was ready for inspection. To the best of my knowledge this first article test was never presented to the government for inspection.

(Gov't reply, decl. ¶ 2)

PSI may not rest upon vague, unsupported allegations of a delay in government inspection of the First Article to defeat DLA's summary judgment motion. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue for trial." *Penn Screw and Machine Works, Inc.*, ASBCA No. 32382, 89-3 BCA ¶ 22,205 at 111,694. Based on our examination of the evidence presented and cited in response to DLA's motion, and drawing all reasonable inferences in favor of PSI, the nonmovant, we conclude PSI has failed to show that a reasonable fact finder could decide PSI was delayed in obtaining a First Article inspection as a result of the sequester when there is no evidence PSI requested such an inspection prior to its contractually-required delivery date. *See DCX, Inc.*, 79 F.3d at 134 (no evidence actual contractor inspection delayed to meet requirements of higher priority contracts; contractor thus failed to meet burden to show excusable delay in inspection); *Mingus Constructors*, 812 F.2d at 1390-91 (party opposing summary judgment must show an evidentiary conflict on record; mere denials or conclusory statements are insufficient).

7

PSI further contends in opposition to DLA's motion that, by entering into bilateral Modification No. P00002 extending the First Article delivery date, DLA represented a no-cost termination could be issued if PSI failed to timely deliver and PSI consented to a "no-cost termination" (app. resp. at 9-10). PSI argues that there are "[m]aterial questions of fact" in this appeal "whether the Government even considered a no-cost termination for convenience as promised in the agreed-upon Modification P00002," which require the factual record be more fully developed concerning the reasonableness of the COs' action and which preclude grant of summary judgment to DLA (*id.*).

DLA argues that the CO's actions were wholly consistent with the language of contract Modification No. P00002 and that there are no genuine issues of material fact regarding compliance with that modification because the question of whether the language in the modification precluded the CO from terminating the contract for default is a question of "law," not a question of "fact." According to DLA, contract Modification No. P00002 simply authorizes the parties' contract to be terminated in its entirety "at no cost to the Government," not at no cost to PSI. (Gov't reply br. at 3-5)

DLA is correct that contract interpretation is a question of law and therefore amenable to resolution by motion for summary judgment. *E.g., Sevenson Environmental Servs., Inc. v. Shaw Environmental, Inc.*, 477 F.3d 1361, 1364 (Fed. Cir. 2007); *P.J. Maffei Building Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984). We interpret a contract in accordance with its express terms and begin with the plain language of that agreement. *E.g., C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). If the "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *E.g., United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997); *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993).

Modification No. P00002 to the parties' contract expressly provides that, "if the First Article re-submission is not delivered by the date [due]..., this contract may be terminated in its entirety at *no cost to the Government*" (emphasis added). While PSI appears to desire a termination of the contract for the convenience of the government that would result in *no cost to PSI,* the modification does not require a termination at no cost to PSI if PSI fails to deliver by the due date. Nor does it mention a termination for the convenience of the government. By its plain language, it simply authorizes a termination which results in *no cost* to DLA. A termination for default is such a termination and clearly within the express terms of the contract modification. *See Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322 (Fed. Cir. 1997) (words of a contract are deemed to have their ordinary meaning); *Churchill Chemical Corp. v. United States*, 602 F.2d 358, 362 (Ct. Cl. 1979) (it is well established that a contract may be terminated for default pursuant to default clause if contractor fails to

8

comply with the delivery schedule); *Artisan Electronics Corp. v. United States*, 499 F.2d 606, 611 (Ct. Cl. 1974) (default may lie even where an incremental delivery date is missed); *Environmental Devices, Inc.*, ASBCA No. 37430 *et al.*, 93-3 BCA ¶ 26,138 at 129,934 (if parties execute modification establishing new delivery date, contractor must deliver by new date unless delayed by excusable causes arising *after* contract modification execution).

PSI asserts additionally that FAR 49.101(b) mandates the CO effect a no-cost settlement instead of a termination for default where it is known the contractor will accept one, no government property was furnished the contractor, and there are no outstanding payments or debts that the contractor owes the government, as PSI asserts is the case here, and there are "[m]aterial questions of fact" in this appeal whether DLA "considered a no-cost termination for convenience." We have held, however, that the government, i.e., DLA, "owes no duty to contractors" to terminate contracts in default for the "convenience of the government," which generally results in the government having to pay monies to the contractor for the costs that the contractor has incurred. *Contact Int'l Corp.*, ASBCA No. 44636, 95-2 BCA ¶ 27,887 at 139,119, *aff'd*, 106 F.3d 426 (Fed. Cir. 1996) (table); *Rotair Indus., Inc.*, ASBCA No. 27571, 84-2 BCA ¶ 17,417 at 86,749-51; *see generally* FAR 49.201(a).[*]

Moreover, it is well established a fact is "material" only if it may affect the outcome, i.e., the finding of that fact is relevant and necessary to the proceeding. A genuine dispute arises regarding that material fact if sufficient evidence is presented that a reasonable fact finder could decide that fact in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Opryland USA Inc. v. Great American Music Show, Inc.*, 970 F.2d 847, 849-50 (Fed. Cir. 1992). In sum, as the nonmoving party here, PSI must present sufficient evidence showing that a specific conflict exists regarding a "material fact." *Opryland USA*, 970 F.2d at 850; *Lemelson v. TRW, Inc.*, 760 F.2d 1254, 1261 (Fed. Cir. 1985). PSI, however, has failed to show that there is any genuinely disputed question of material fact which precludes grant of summary judgment to DLA here.

---

[*] We note that, while PSI asserts FAR 49.101(b) requires a CO to consider a "no-cost" settlement instead of a default termination when it is known that the contractor will accept one and certain other factors exist (app. opp'n at 8), even if we were to assume PSI's interpretation of FAR 49.101(b) was correct, there is no reason to believe here that the CO thought PSI would accept such a settlement since PSI expressly rejected such a "no-cost" termination for convenience when it was previously offered by the CO.

## CONCLUSION

We grant the government's motion for summary judgment. The appeal is denied.

Dated: 13 July 2015

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59116, Appeal of Precision Standard, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

10